UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LINDA M. PRICE,

                              Plaintiff,

        v.                                                    1:05-CV-0465
                                                                 (LEK/DRH)
SAUGERTIES CENTRAL SCHOOL DISTRICT,
RICHARD RHAU, Superintendent of Schools,
sued in his individual and official capacity, and
TIMOTHY PRICE, sued in his individual and
official capacity,

                              Defendants.

_____

### MEMORANDUM-DECISION AND ORDER

### I.  FACTS

        Plaintiff Linda Price ("Plaintiff") is an English teacher employed by the Defendant

Saugerties Central School District ("SCSD" or "Defendant").  On September 7, 2004,

Defendant Superintendent of Schools Richard Rhau ("Rhau") instructed all school district

staff to follow a communication protocol (the "communication protocol" or "communication

policy") for reporting concerns about the SCSD.  Plntf's Decl. (Dkt. No. 3, Attach. 3) at ¶ 2.

Under the policy, employees are to address concerns with their supervisors first.  If they are

not satisfied with the response or resolution at that level (step one), they are to bring their

concerns to the district supervisor (Superintendent Rhau) (step two).  If they still feel their

concerns were not addressed, they may then contact the Board of Education (step three).

Plntf's Decl. (Dkt. No. 3, Attach. 3) at ¶ 4.

On November 3, 2004, Plaintiff sent an e-mail to her colleagues using the SCSD e-mail system complaining about, *inter alia*, the teachers' union, harassment of teachers, and the scheduling of parent-teacher conferences.  Plntf's Decl. (Dkt. No. 3, Attach. 3) at ¶ 7 & Ex. 3.  The next day, Rhau wrote a memorandum to Plaintiff stating that he wanted to meet with her "to discuss [her] e-mail memo to colleagues."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 4.  At the November 9, 2004 meeting, Rhau expressed his disappointment at Plaintiff's failure to follow the communication protocol with respect to the presentation of employee complaints in her e-mail.  Id.  Rhau also expressed his disappointment concerning a letter Plaintiff sent to the Board of Education in October 2004 wherein she complained that, among other things, the "Saugerties school system fails new administrators and new teachers in not giving them adequate training, guidance and support."  Id.  Rhau also discussed Plaintiff's inappropriate use of the SCSD's computer network.

On December 9, 2004, a plastic soda bottle exploded inside a student locker.  The SCSD investigated and determined that the cause of the explosion was a leftover classroom experiment involving students making root beer.  The SCSD concluded that a student placed the bottle in a locker and "the fermentation process exceeded the limits of the plastic bottle."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 1.  Plaintiff disapproved of the SCSD's investigation and conclusion.  She believed that the soda bottle was intended as an explosive device that should have been investigated more seriously.  Accordingly, Plaintiff contacted the Town of Saugerties Police Department to report the matter.  Plntf's Decl. (Dkt. No. 3, Attach. 3) at ¶ 3. Plaintiff spoke with Sergeant Donald Tucker, who also was a member of the Board of Education.  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.

On December 13, 2004, Defendant Saugerties Senior High School Principal Timothy Price wrote Plaintiff a letter reminding her of her obligation to comply with the communication protocol.  Plaintiff was directed to follow the communication protocol, and "[f]ailure to do so will result in the administration recommending disciplinary action be taken against you."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.   After determining that Plaintiff contacted Tucker in his capacity as a police officer, rather than as a member of the Board of Education, Defendants removed the December 13, 2004 letter from Plaintiff's file.  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.  On March 3, 2005, however, Defendants placed an almost identical warning letter in Plaintiff's file.  In that letter, Price wrote that:

> Your contacting a member of the Town of Saugerties Police Department regarding the December 9, 2004 incident was both unprofessional and exceeded your authority.  You were aware that both the Assistant Principal (Mr. Fred Hirsch) and the School Resource Officer (Policeman Jorge Castagnola,) were at the site of the incident and were handling the matter. . . . You also chose to go outside the protocol process. . . . Because of your actions of December 9, 2004, you have. . . shown disregard for proper protocol.  With this letter, I am directing you to follow the communication protocol outlined above.  Failure to do so will result in the administration recommending disciplinary action be taken against you.

Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.

Based on the foregoing allegations, Plaintiff commenced the instant action pursuant to 42 U.S.C. §§ 1983 & 1988, claiming a violation of her First Amendment rights.  Complaint (Dkt. No. 1).  Presently before the Court is Plaintiff's motion for a preliminary injunction enjoining Defendants from enforcing the communication protocol.  Plntf's Motion (Dkt. No. 3).

## II.  STANDARD OF REVIEW

To obtain a preliminary injunction, Plaintiff must demonstrate: "(1) that. . . she will suffer irreparable harm absent injunctive relief, and (2) either (a) that. . . she is likely to

succeed on the merits, or (b) '"that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party."'" Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 510 (2d Cir. 2005) (citing and quoting cases). "[W]here a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied." Green Party of New York State v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). "When the injunction alters the status quo, as does this one, plaintiffs must show a substantial likelihood of success." Id. (internal quotations and citation omitted).

## II.  DISCUSSION

Government employees do not give up their free speech rights by virtue of their employment with the government. See Harman v. City of New York, 140 F.3d 111, 117 (2d Cir. 1998). That speech is not, however, absolute. In certain circumstances, the government may impose restraints on speech that are necessary for the government employer to promote the efficiency of the public services it performs through its employees. See id.; Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Whether speech may be restricted in a particular circumstance requires a balancing of the government's interests in avoiding a disruptive workplace against the interests of the citizen employee in commenting upon matters of public concern. Id. The government has considerable leeway in restricting speech "upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147 (1983). When an employee seeks to speak on a matter of public concern, however, "the government bears the burden of

justifying any adverse employment action."  Harman, 140 F.3d at 117 (citing Rankin v.
McPherson, 483 U.S. 378, 388 (1987)).

Another significant consideration is whether there is an *ex post* disciplinary action or
an *ex ante* speech restriction.  In this case, Defendants' policy regulates speech concerning
school matters.  Specifically, the policy restricts school employees' avenues of
communication.  Although a violation of the policy could result in discipline, the policy acts as
a prior restraint.  As such, the policy is an *ex ante* restriction on expression, rather than an *ex
post* punishment for speech.  Latino Officers Ass'n v. City of New York, 196 F.3d 458, 463
(2d Cir. 1999).  Accordingly,

> the Government must show that the interests of both potential audiences
> and a vast group of present and future employees in a broad range of
> present and future expression are outweighed by that expression's
> necessary impact on the actual operation of the Government. . . .  Further,
> the government must do more than simply posit the existence of the
> disease sought to be cured. . . . It must demonstrate that the recited
> harms are real, not merely conjectural, and that the regulation will in fact
> alleviate these harms in a direct and material way.

Latino Officers Ass'n, 196 F.3d at 463 (internal quotations, citations and alterations omitted;
citing cases).

An analysis of two Second Circuit Court of Appeals cases is instructive in resolving
the pending motion for a preliminary injunction.  In Harman, 140 F.3d 111, a New York City
social services agency had a policy whereby all communications with the media were
required to be "referred to the . . . Media Relations Office before any information is conveyed
by an employee. . . ."  Id. at 116.  The speech at issue concerned the effectiveness of the
City's child welfare agency, a matter found to be of public concern.  The Second Circuit
concluded that the media relations policy was unconstitutional for several reasons.  First,

because the policy directly regulated speech, it allowed the government to determine in advance what kind of speech will harm agency operations and, therefore, ran afoul of the general presumption against prior restraints on speech.  Second, the Circuit found that the pre-clearance requirement "may have a broad inhibiting effect on all employees, even those who might ultimately receive permission to speak. . . . [P]reclearance requirements pose risks of self-censorship by speakers in order to avoid being denied a license to speak."  Id. at 120 (internal quotations and citation omitted).  Third, "the prior approval mechanism allow[ed] the [government] agencies to control the timing of the intended speech", thereby having the power to control the newsworthiness of the speech.  Id.  Fourth, the policy left the determination of who may speak to the unbridled discretion of a government official.  Id.  The Second Circuit summarized the problems with the media relations policy as follows:

> By mandating approval from an employee's superiors, they will discourage speakers with dissenting views from coming forward.  They provide no time limit for review to ensure that commentary is not rendered moot by delay.  Finally, they lack objective standards to limit the discretion of the agency decision-maker.

Id. at 121.

        In Latino Officers Ass'n v. Safir, 170 F.3d 167 (2d Cir. 1999) , the New York City Police Department had a policy that required officers to provide notice to the police department in advance of any speaking engagement and to provide a written summary of the speech the next business day after the engagement.[1]  The Second Circuit held that the

---

[1] The original policy at issue in this case also required officers to obtain approval from the police department before speaking, and required a superior officer at the speaking engagement.  The United States District Court for the Southern District of New York found the policy to violate the officers' First Amendment rights and entered a preliminary injunction barring its enforcement.  On appeal, the City opted not to pursue the policy's prior approval or supervision requirements.  Thus,

(continued...)

plaintiffs failed to establish irreparable harm or a likelihood of success.  On the issue of

irreparable harm, the Second Circuit stated:

> Although we acknowledge that, as a theoretical matter, [the notice and
> reporting requirements] may make some officers more reluctant to speak
> than they would be if they did not have to bring their speech to the
> Department's attention . . ., this kind of conjectural chill is not sufficient to
> establish real and imminent irreparable harm.

Latino Officers Ass'n, 170 F.3d at 171 (internal citations omitted).

Turning to the issue of the likelihood of success on the merits, the Second Circuit

found that "the notice and reporting procedure strikes a reasonable balance between" the

officers' interest in an unfettered dissemination of their views regarding the police department

and the Department's strong interest in staying informed of police officers' public statements

about the Department.  Id. at 172.  The Latino Officers Ass'n Court found that:

> [n]one of the *Harmon* concerns are present in this case.  In the absence of
> the approval requirement, there is no opportunity for the City to suppress
> or delay speech expressing dissenting views.  The sole concern that
> exists is the potential that, because employees must alert the Department
> to the fact that they will be speaking, some individuals with unpopular
> views will be reluctant to come forward. . . . [H]owever, we find that
> plaintiffs have not adequately demonstrated that there is a real threat that
> the notice and reporting requirements, divorced from the approval and
> supervision requirements, will chill their speech.

Latino Officers Ass'n, 170 F.3d at 172.

In this instant matter, it is questionable whether all of Plaintiff's speech is of public

concern.  For example, Plaintiff's communications concerning the effectiveness of the

teachers' union likely involve speech of a private, employment related matter.  Plaintiff's

---

[1](...continued)
the only parts of the policy before the Second Circuit were the notice and reporting requirements.
Latino Officers Ass'n, 170 F.3d at 168-69.

- 7 -

speech directed to the police department concerning whether a student attempted to place an

explosive device in a public school building, however, may impact matters of public concern.

The same may be said about Plaintiff's letter to the school board concerning the

effectiveness of the school system in training, guiding and supporting new administrators.

See Latino Officers Ass'n, 196 F.3d at 466 ("A statement is of public concern if, in light of 'the

content, form, and context of [that] statement, as revealed by the whole record,' it can be

'fairly considered as relating to any matter of political, social, or other concern to the

community.") (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  The relevant inquiry is

not, however, limited to Plaintiff's own experience.  As noted, the communication policy is an

*ex ante* restriction on speech.  Defendants' policy is broadly written, covering any "concerns

or issues dealing with school matters."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.  The net

of Defendants' restriction on speech concerning "school matters" is sufficiently broad to

capture matters of public concern, including speech that would not have any disruptive effect

on the operation of the school district.  As such, the burden is on Defendants to show that the

"interests of both potential audiences and *a vast group of present and future employees in a*

*broad range of present and future expression* are outweighed by that expression's 'necessary

impact on the actual operation' of the Government."  Latino Officers Ass'n, 196 F.3d at 463

(emphasis added).

Defendants have failed to sustain their burden.  In their papers in opposition to

Plaintiff's motion for a preliminary injunction, Defendants have pointed to no harms that are

likely to be ameliorated by the communications policy.  Looking through the record, the Court

has found Defendant Timothy Price's March 3, 2005 disciplinary letter to Plaintiff, wherein he

writes that Plaintiff's actions "could have confused and clouded a situation, had it been a

more serious one.  You . . . undermin[ed] those responsible for the safety and welfare of the student body and, if it had been a more serious situation, placing students in danger."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.  This letter offers nothing more than conjecture and falls far short of linking the communications policy to ameliorating any harms in a direct and material way.  Accordingly, Defendants have failed to identify any interests justifying the communications policy.

The Court finds this case to be substantially on par with the facts in <u>Harman</u>. Defendants' communications policy provides ample opportunity for the suppression or delay of speech.  First, the communications policy limits the avenues of speech.  The communications policy restricts speech to the employee's supervisor, the superintendent, and the board of education.  The communications policy makes no allowance for speech to any persons or entities other than the supervisor, superintendent or board of education.  That the policy prohibits speech outside of the protocol is evidenced by the March 3, 2005 letter from Defendant Price to Plaintiff wherein Plaintiff was reprimanded for contacting a member of the Town of Saugerties Police Department because, among other things, she "chose to go outside the [communications] protocol process."[2]

Second, the communications policy allows Defendants to control the timing of the speech.  The communications policy contains a three-step process.  Before proceeding from the first step to the second step, the speaker awaits "the response or resolution at the building level."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at Ex. 2.  If the speaker is not satisfied with the response or resolution at the building level, he or she may then proceed to the second

---

[2] At the very least, the communications policy does not allow for other communications until the speech has first gone through the supervisor, the superintendent, and the board of education.

step - the superintendent.  Id.  The speaker then must await resolution by the superintendent.  Id.  If the speaker feels his or her concerns "were not addressed, [he or she] may then contact the Board of Education as a whole and be scheduled for the next regular board meeting."  Id.  Even assuming, *arguendo*, that an employee could immediately determine that the response at the building and superintendent levels were inadequate, he or she would have to wait until the next regularly scheduled Board meeting before proceeding to step three or beyond.  Through this process, Defendants have the ability to substantially delay speech.

Third, by requiring employees to go through these steps, the communications policy "may have a broad inhibiting effect on all employees."  Harman, 140 F.3d at 120.  Plaintiff states in her Declaration: "[a]s I do not wish to be disciplined or counseled any further, the speech protocol has discouraged me from further speaking out on important matters of public concern."  Plntf's Decl. (Dkt. No. 3, Attach. 3) at ¶ 14.  Thus, there is evidence of an actual chilling effect.

### III.  CONCLUSION

For the foregoing reasons, the Court finds that the communications policy restricts the First Amendment rights of Plaintiff and Saugerties School District employees.  Because Defendants have a broad *ex ante* communications policy that covers all speech concerning school matters, such matters could include matters of public concern, and Defendants have failed to articulate any governmental interests that necessitate the communications policy, the Court finds that Plaintiff has demonstrated irreparable harm and a likelihood of success on the merits.

Wherefore, it is hereby

**ORDERED**, that Plaintiff's motion for a preliminary injunction enjoining enforcement of the communications policy (Dkt. No. 3) is **GRANTED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED**.

Dated:   February 09, 2006
         Albany, New York

Lawrence E. Kahn
U.S. District Judge